# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LETITIA KOLETTE FEREBEE, | ) | |
| | ) | Case No. 09-75200-SCS |
| *Debtor.* | ) | |
| | ) | |
| SHARON JOHNSON-CLAYTON, | ) | |
| | ) | APN 10-07086-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LETITIA KOLETTE FEREBEE, | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial upon the Amended Complaint to Determine Dischargeability of Debt and Objecting to Discharge filed on April 22, 2011, by the Plaintiff, Sharon Johnson-Clayton ("Johnson-Clayton") against the debtor, Letitia Kolette Ferebee ("Ferebee").  The trial commenced September 21, 2011, was continued on November 2, 2011, and was completed on December 5, 2011, at which time the Court took this matter under advisement.  The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).  This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7052.

### I.  The Amended Complaint and Answer to Amended Complaint

The Amended Complaint to Determine Dischargeability of Debt and Objecting to Discharge

filed by Johnson-Clayton ("Amended Complaint") proceeds against Ferebee on two distinct bases.

First, in Counts One through Four, Johnson-Clayton alleges she made various loans to Ferebee

("Personal Loans"), which indebtedness should not be discharged pursuant to 11 U.S.C. §§ 523(a)(2)

and (a)(6). The factual circumstances surrounding the Personal Loans are complicated and highly

contested by Ferebee, and the Personal Loans were not evidenced by any promissory notes or other

writings. However, the circumstances of the remaining allegations of the Amended Complaint, as

contained in Count Five, are certain enough to permit the Court to avoid untangling the Gordian knot

of the Personal Loans.[1] The allegations in Count Five focus on the entitlement of Ferebee to a

discharge in this case pursuant to 11 U.S.C. § 727. The relevant allegations of the Amended

Complaint in support of Johnson-Clayton's prayer that the Court deny Ferebee's discharge are as

follows:

> 40. [Ferebee] owned the following jewelry, with the following approximate values,
> on and after the following dates:

| | | |
|---|---|---|
| Diamond Enchantment Ring | $5,200.00 | October 12, 2006 |
| Rolex Watch | $8,450.00 | September 26, 2005 |
| 18 k [*sic*] White Gold 1.5 Carat Diamond Stud Earrings | $3,495.00 | September 6, 2005 |
| 10k Gold Stamped Bracelet | $500.00 | March 22, 2007 |

---

[1] As a result of this Court's findings of fact and conclusions of law concerning Count Five of the Amended Complaint, which prays that the Court deny Ferebee's discharge, it is unnecessary to address the remaining counts of the Amended Complaint, and the Court will treat them as mooted by the adjudication of Count Five. Further, as to the Motion to Amend the Complaint to conform it to the evidence pursuant to Federal Rule of Civil Procedure 15(b), as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7015, made during the trial by counsel for Johnson-Clayton, the Court also finds that motion is mooted by the adjudication of Count Five of the Amended Complaint.

| | | |
|---|---|---|
| Channel Diamond Bracelet | $8,000.00 | March 14, 2007 |
| 3/4 Carat Diamond Stud Earrings Set in Platinum | $1,498.50 | July 3, 2005 |
| Ladies White Satin Diamond Bracelet | $3,000.00 | March 17, 2007 |
| Wedding Ring | Unknown Value | 2007-2008 |
| 2 Carat Diamond Cluster Bracelet | $1,500.00 | March 17, 2007 |
| Sub-Total | $31,643.50 | |

41. [Ferebee] owned several other pieces of valuable jewelry in the time frames listed above, and additional information concerning same will be sough tin [*sic*] discovery.

42. [Ferebee] has stated under oath that she believes the jewelry listed in the table above (without limitation, the "Known Jewelry") went missing some time in 2008 or 2009.

43. She has no particularized knowledge of the dates the jewelry went missing, and it allegedly left piece by piece.

44. [Ferebee] has stated under oath that her estranged husband stole this jewelry from her home, and, in the alternative, that the jewelry belonged to him.

45. No police report was filed with respect to any of the alleged thefts.

46. No insurance claim was submitted as a result of any of the alleged thefts.

47. On September 15, 2009, [Ferebee] entered into the Stipulation and Agreement Pursuant to Title 20, Section 109 and 109.1 Code of Virginia, 1950, As Amended (the "Separation Agreement").

48. There is no reference to the Known Jewelry in the Separation Agreement.

49. There is no reference to the Known Jewelry, or any claim to recover this jewelry, in [Ferebee's] Lists, Schedules and Statement of Financial Affairs.

50. [Ferebee's] schedules merely refer to $50 worth of jewelry of indeterminate type. At her 341 meeting of creditors, [Ferebee] wore platinum and diamond earrings she

3

purchased for more than $1,000 in October 2006.  She also possessed on the filing date a gold ring she purchased for $500.

51. At her 2004 examination on May 18, 2010, [Ferebee] acknowledged that she had several gold bracelets and she just does not know where they are now.

Amended Complaint ¶¶ 40-51.

By reason of the foregoing, Johnson-Clayton alleges that Ferebee has concealed, or permitted to be transferred, removed, or concealed, with the intent to hinder, delay, or defraud creditors, her jewelry within one year of the filing of the petition, and thus cause exists to deny Ferebee's discharge pursuant to 11 U.S.C. § 727(a)(2)(A).  Johnson-Clayton also asserts that, by her lists, schedules, and statement of financial affairs, Ferebee has made a false oath by failing to accurately list and value her jewelry, which should cause the denial of her discharge pursuant to 11 U.S.C. § 727(a)(4)(A).  Finally, Johnson-Clayton contends that Ferebee has failed to satisfactorily explain the loss of her jewelry, and she should be denied her discharge pursuant to 11 U.S.C. § 727(a)(5).

Ferebee responded to the Amended Complaint, admitting in part and denying in part Johnson-Clayton's allegations.[2]  Ferebee specifically admits that "years ago she did own the jewelry" listed in paragraph forty (40) of the Amended Complaint but avers the listed values are retail values that are irrelevant because she (Ferebee) was not in possession of the jewelry at the time she filed her bankruptcy petition.  Answer ¶ 40.  Ferebee also admits that she has, in the past, owned other

---

[2] Ferebee requests, within her Answer to the Amended Complaint, that, as to all five counts, sanctions pursuant to Federal Rule of Bankruptcy Procedure 9011 be imposed upon Johnson-Clayton and her counsel on the basis that the Amended Complaint "is not based on fact or existing law, but rather for the improper purpose to attempt to extract a settlement . . . ."  Answer at 5-6; 8; 9; 12.  As the Court has determined that analysis and determination regarding Counts One through Four is unnecessary in light of its conclusions as to Count Five, the Court also finds that the request for the imposition of sanctions as to Counts One through Four is likewise moot.  The Court will address the request for sanctions regarding the allegations in Count Five *infra* within its conclusions of law.

jewelry, as Johnson-Clayton alleges in paragraph forty-one (41), but on the date of filing she was in possession only of the jewelry she listed on her Schedule B of personal property and which she exempted on her Schedule C of property claimed as exempt. *Id.* ¶ 41. As to the value of the jewelry in her possession at the time of filing, Ferebee asserts that she listed "the value that she thought she could get for it . . . " and denies Johnson-Clayton's assertions as to the value of the jewelry. *Id.* ¶ 50.

## II. Findings of Fact

### A. The Petition

Ferebee filed her voluntary petition under Chapter 7 of the Bankruptcy Code on December 15, 2009. In her Schedule B of personal property, filed simultaneously with the petition, Ferebee listed the following items under paragraph seven (7), which requires a debtor to list furs and jewelry: "Earrings (3), Necklace/Chain (2), Bracelet (3), Watch (1), Ring (2)," (hereinafter, "Scheduled Jewelry"), with a scheduled value of $50.00. Johnson-Clayton Exh. 39, Ferebee Schedule B (filed in Case No. 09-75200-SCS, at docket entry 1).[3]

### B. The Jewelry Purchases and Repairs

Ferebee has stipulated to the following purchases of jewelry prior to filing her Chapter 7 petition:

> 7. The Plaintiff purchased the following jewelry from Reed's Jewelers on the following dates:
>
> a. Rolex watch – 9/5/04

---

[3] Johnson-Clayton filed an Amended Schedule B on April 5, 2010. The items listed in paragraph seven (7) were identical in type to those listed in the original Schedule B, as was the assigned value of $50.00. *See* Johnson-Clayton Exh. 42, Ferebee Amended Schedule B (filed in Case No. 09-75200-SCS, at docket entry 30).

b. Rolex Watch – 9/26/05 (upgrade/trade in watch)

c. 10/18/06 – 3/4 CTW diamond and white gold pave hoop earrings

d. 9/6/05 – 1/2 Carat Diamond earrings (upgrade/trade in earrings)

e. 12/12/05 – 14 Carat [*sic*] Gold Wedding Band

f. 3/22/07 – Ladies Gold stamped 10 Carat [*sic*] bracelet

g. 7/3/05 – 3/4 Carat Diamond Stud earrings

8. On October 12, 2006, the Plaintiff purchased a 1.55 total weight diamond and gold ring from Nygaard Jewelers.

Stipulation ¶¶ 7-8.

More detailed evidence of these purchases was introduced at trial. Johnson-Clayton offered into evidence Exhibit 48,[4] a receipt issued by David Nygaard Fine Jewelers to Ferebee dated October 12, 2006, for Ferebee's purchase of an enchantment ring in the amount of $5,200.00 ("Enchantment Ring"). The ring described in Exhibit 48 appears to match the ring detailed in paragraph eight (8) of the Stipulation.[5]

Johnson-Clayton also exhibited a number of receipts from Reeds Jewelers ("Reeds") in her Exhibit 49.[6] Exhibit 49(a) is a receipt for the purchase by Ferebee from Reeds on September 5, 2004, of a Rolex watch for $5,425.00 ("First Rolex"). Exhibit 49(b) is a receipt from Reeds for the purchase by Ferebee of a Rolex watch for $7,858.50 on September 26, 2005 ("Second Rolex"), where she apparently traded in the First Rolex for a $3,700.00 credit toward the purchase price of

---

[4] Ferebee did not object to Exhibit 48.

[5] The item description on the receipt is as follows: "1.55tw G/vs2 18kw Hof Enchantment Ring." Johnson-Clayton Exh. 48.

[6] Ferebee did not object to any of the documents contained in Exhibit 49.

the Second Rolex.  Exhibit 49(c) is a receipt for the purchase by Ferebee from Reeds on October 18,

2006, of a pair of 3/4 carat total weight pavé hoop earrings for a total purchase price of $1,024.99

("Hoop Earrings").[7]  Ferebee remains in possession of the Hoop Earrings and included them in the

jewelry scheduled on her Schedule B of personal property with a combined value of $50.00.

Ferebee wore the Hoop Earrings to her Section 341 meeting of creditors on January 21, 2010 (*see*

Johnson-Clayton Exh. 53, First Deposition, at 135, discussed *infra*; *see also* Johnson-Clayton Exh.

55, Transcript of Section 341 Meeting of Creditors, held January 21, 2010, at 25), and the Court

observed Ferebee wearing the Hoop Earrings during the first day of the trial of the Amended

Complaint.[8]  Exhibit 49(d) is a receipt from Reeds for Ferebee's purchase on September 6, 2005,

of 1-1/2 carat total weight diamond stud earrings for $3,199.95 ("Diamond Studs").[9]  Exhibit 49(g)

is a receipt for the purchase from Reeds by Ferebee of a wedding band priced at $399.95[10] on

---

[7] These earrings appear to be the same as those described in subparagraph (c) of paragraph seven (7) of the Stipulation.

[8] *See* Partial Transcript of Trial Testimony of Letitia Ferebee, September 21, 2011, filed December 5, 2011, at 112 (wherein Ferebee confirmed she was wearing the Hoop Earrings).

[9] The item description of the earrings on the receipt states as follows: "1 1/2 CTTW Cert Stud Ear 18K W."  Johnson-Clayton Exh. 49(d).  The receipt further reveals that Ferebee received a "trade-in" credit of $1,498.50 for an unspecified piece of diamond jewelry.  *Id.*  The date of purchase, as well as the trade-in information of these earrings, matches the earrings described in subparagraph (d) of paragraph seven (7) of the Stipulation; however, the carat weight of the diamond stud earrings described in the Stipulation is a full carat less than those described in the receipt.  No other receipt was exhibited demonstrating that Ferebee purchased another pair of diamond stud earrings on September 6, 2005, but, given the allegations made in paragraph forty (40) of the Amended Complaint, which references "18 k [*sic*] White Gold 1.5 Carat Diamond Stud Earrings" purchased on September 6, 2005, the Court will presume that the Stipulation contains a scrivener's error as to the total carat weight of the earrings referenced in subparagraph (d) of paragraph seven (7).

[10] The total price reflects a $100.00 credit Ferebee received.  *See* Johnson-Clayton Exh. 49(g).

December 12, 2005 ("Wedding Band").

Exhibit 49(m) is a receipt issued by Reeds to Ferebee dated March 14, 2007, for the repair of a Channel bracelet with an estimated value of $8,000.00 ("Channel Bracelet").  Exhibit 49(n) consists of a receipt issued to Ferebee by Reeds documenting a repair estimate for a ladies gold stamped 10k flex bangle bracelet, wherein the bracelet's value was noted as $500.00 on that date (March 16, 2007) ("10k Bracelet").[11]  Per Exhibit 49(o), Ferebee purchased a pair of 3/4 carat total weight diamond stud earrings ("3/4 carat Diamond Studs") for a total purchase price of $1,568.49 from Reeds on July 3, 2005, which appear to be the same earrings referenced in subparagraph (g) of paragraph seven (7) of the Stipulation.  Exhibit 49(r) is an estimate from Reeds given to Ferebee on March 17, 2007, for the repair of a ladies white satin yellow bracelet ("White Satin Bracelet").  The estimate lists the value of the White Satin Bracelet as $3,000.00.[12]  Exhibit 49(v) is a repair estimate from Reeds dated March 17, 2007, to Ferebee for a yellow metal cluster bracelet ("Cluster Bracelet").  The repair receipt lists the Cluster Bracelet as having a value of $1,500.00.  The receipt also references a repair estimate for a white metal bracelet, which Reeds also valued at $1,500.00.[13]  The combined purchase price or listed value (in the instance of a repair estimate) of the Second Rolex, the Hoop Earrings, the Diamond Studs, the Wedding Band, the Channel Bracelet, the 10k Bracelet, the 3/4 carat Diamond Studs, the White Satin Bracelet, and the Cluster Bracelet is

---

[11] When examined in conjunction with Johnson-Clayton Exhibit 49(j), a receipt for the repair to a "Lds Gold Stamped 10k Bracelet" dated March 22, 2007, the bracelet described in Johnson-Clayton Exhibit 49(n) appears to be the same bracelet described in subparagraph (f) of paragraph seven (7) of the Stipulation.

[12] Exhibits 49(s), 49(t), and 49(u) appear to relate to the repair estimates for the same White Satin Bracelet.

[13] Exhibits 49(w), 49(x), and 49(y) appear to be repair receipts or estimates for the same Cluster Bracelet and white metal bracelet.

$27,051.88.  When the purchase price for the Enchantment Ring is added, the total purchase price

or value estimate for this jewelry of Ferebee is $32,251.88.  The jewelry referred to herein as the

"Missing Jewelry," which consists of the Second Rolex, the Diamond Studs, the Channel Bracelet,

the 10k Bracelet, the 3/4 carat Diamond Studs, the White Satin Bracelet, the Cluster Bracelet, and

the Enchantment Ring (as set forth in paragraph forty (40) of the Amended Complaint), has a total

purchase price or estimate of value of $30,826.94.

C.  The Explanations for the Missing Jewelry and Valuation of the Scheduled Jewelry

Ferebee admits that she no longer has the Missing Jewelry within her possession.  *See*

Answer ¶ 40.  Ferebee's deposition upon oral examination was taken in this case on May 18, 2010,

and was admitted without objection as Exhibit 53 ("First Deposition") at trial.  In her First

Deposition, Ferebee testified as to what happened to the Missing Jewelry.

With respect to the Enchantment Ring she purchased for $5,200.00, Ferebee admitted she

no longer has it.  When questioned as to what happened to it, Ferebee answered, "I don't know.  I

take it my husband have [*sic*] it.  I don't know."  In response to the inquiry, "So the only way that

your husband could have this is if he stole it from you," Ferebee answered, "Yes."  Johnson-Clayton

Exh. 53 at 117.  Ferebee attributed the theft of the Enchantment Ring to her husband because of their

bitter separation and divorce.  *Id*. at 118.[14]  The Enchantment Ring was noticed as missing when

---

[14] In the First Deposition, Ferebee testified as follows:

Q. "So you have no reason to believe that your husband took this—you have no
particular—excuse me.  Do you have any particularized knowledge that your
husband stole this [Enchantment Ring]?

A. Yes. I feel he took it.

Q. What makes you feel that way?

other items went missing.  When asked exactly when these items were noticed as missing, Ferebee

answered, "Starting from '05 to '09 things just have been missing.  I couldn't tell you."  *Id.* at 119.

When asked if she had filed a police report, Ferebee advised, "I reported a lot of things to the police

but they said they would have to indict everybody that was in the house."  *Id.* at 118.

Ferebee also testified about the Second Rolex.  When asked what happened to the Second

Rolex, Ferebee testified, "I don't know," and "I don't know where my jewelry is."  *Id.* at 125.

Ferebee believes her husband took the Second Rolex, but when asked when he took it, she

responded, "I don't know," *id.* at 126.  Ferebee did not make a police report as to the alleged theft

of the Second Rolex.  *Id.* at 127.  Ferebee asked her husband at some point where her jewelry was,

and he allegedly responded, "I don't have it."  *Id.*  Ferebee never reported any of the alleged thefts

of her jewelry to any insurance company.  *Id.* at 128.  Ferebee also admitted the Diamond Studs

were missing but did not know when they went missing.  *Id.* at 132, 134.  When asked what

happened to the Diamond Studs, Ferebee responded, "I don't know what happened to any of it.  I

say my husband has my jewelry.  He says he don't [*sic*]."  *Id.* at 132.

_____

A. The bitter separation, divorce, the whole bitter thing between both of us.

Q. Other than the bitter separation and the divorce, is [*sic*] there any other specific facts that make you think that your husband stole this ring?

A. Just to hurt me. That is all I can think of.

Johnson-Clayton Exh. 53 at 118-19.  Ferebee further testified at the First Deposition that she was abused by her husband, suffering a black eye on one occasion, which injury Johnson-Clayton observed.  *Id.* at 38.  She related that she obtained a restraining order against her husband at one point.  *Id.* at 145.  Ferebee also testified as to conversations she had with Johnson-Clayton regarding other instances of domestic violence and how fearful she was of her husband.  *Id.* at 39-40; 89.  Similar testimony was adduced at trial.  *See, e.g.*, Partial Transcript of Trial Testimony of Letitia Ferebee, September 21, 2011, filed December 5, 2011, at 7-8.

Ferebee testified she retains the Hoop Earrings and wore them to the First Deposition.  She

testified as to how she valued them for her bankruptcy schedules:

> Q. How did you—if the purchase price [of the Hoop Earrings] was $975, how did
> you arrive at a $50 value for all your jewelry?
>
> A. Because, basically, all I have is costume jewelry.  This is basically the jewelry
> that I have.  And they were saying what would you get for it if it was sold.  You can't
> take it back to the jewelry store and get what you paid for it.  And I have had it since
> '06.  So that is how I came to $50.
>
> Q. Did you ever attempt to have these diamond earrings valued?
>
> A. No.

*Id.* at 136.  When asked why the value of the Hoop Earrings has diminished so drastically from their

original price of $975.00, Ferebee responded, "I just think that people are going to buy bigger and

better things a little bit cheaper than that now."  *Id.* at 137.

Ferebee testified she has retained the wedding ring and wears it as a thumb ring.  *Id.* at 137-

38.  Ferebee no longer has the 10k Bracelet and offered the identical explanation for its loss as she

had previously testified with respect to the Second Rolex and the Diamond Studs.  *Id.* at 139.  With

respect to the Channel Bracelet, Ferebee testified she did not recall it being repaired.  *Id.* at 140.

When questioned if she has or had a yellow gold bracelet at one time, Ferebee responded, "I had

several," *id.*, and "I couldn't tell you all of the jewelry that I have."  *Id.* at 141.  She does not have

any of the yellow gold bracelets now, *id.*, nor does she have the Cluster Bracelet.  *Id.* at 144.  She

attributes the theft of the Cluster Bracelet to her husband.  *Id.*  In summary, when asked about all

of the Missing Jewelry, Ferebee offered little information:

> Q. You don't have any specific information about any of [the Missing Jewelry], he
> [Ferebee's husband] has never told you that he has stolen any of [the Missing
> Jewelry]?

A. No. I just know him.

Q. And nobody has ever told you that he has taken [the Missing Jewelry] that—nobody has ever told you that he said he took [the Missing Jewelry]?

A. No.

Q. And you don't have any facts whatsoever to suggest that your husband took [the Missing Jewelry] other than your hunch?

A. That is it.

*Id.* at 153-54.

Ferebee admits that, despite her belief that her husband stole her jewelry, her purported knowledge concerning the present whereabouts of her husband is scant, as highlighted in Johnson-Clayton's Exhibit 54, the deposition transcript from Ferebee's second deposition ("Second Deposition"). Ferebee does not know where her husband lives or how to get in contact with him, yet he regularly comes to her residence and takes their son with him for a period of time. *See* Johnson-Clayton Exh. 54 at 6-12.

Ferebee's testimony at trial was similar and equally unenlightening as to what happened to the Missing Jewelry. Ferebee admitted she had stipulated to the jewelry purchases and that she wore and kept these pieces at her home. Partial Transcript of Trial Testimony of Letitia Ferebee, September 21, 2011, filed December 5, 2011 ("Partial Transcript"), at 111. Ferebee also admitted there were a variety of repairs performed by Reed's Jewelers that showed she owned other valuable jewelry in addition to what she purchased at Reed's. *Id.* at 113. Ferebee's explanation at trial for the loss of the Enchantment Ring purchased by her for $5,200.00 remained unchanged from her deposition testimony:

Q. Let's talk about the $5,200 diamond ring that you purchased from Nygaard. You no longer have that ring–

12

A. No.

Q. – Is that correct? You don't know what happened to it?

A. No, I don't.

Q. But you've testified that your husband stole it from you; is that correct?

A. I testified that every time he came around stuff came missing, and all my important things and everything that I've had is gone to—from shoes to cameras to whatever.

Q. Okay. You first noticed that this ring went missing in January of 2009 or thereabouts.

A. I'm not for sure. I don't know exactly when what came up missing. I don't know exact dates, no.

*Id.* at 113-14.  Ferebee again admitted she filed no police report for the Missing Jewelry, did not include any reference to the Missing Jewelry in her separation agreement with her husband, did not list any losses or thefts of jewelry in her bankruptcy papers, and stated she could not file an insurance claim for the Missing Jewelry.  *Id.* at 117-19.  On examination by her counsel, Ferebee succinctly explained what she believed had happened to the Missing Jewelry: "It just disappeared." *Id.* at 181.

Additionally, Ferebee testified as to how she had established the $50.00 value she listed for her Scheduled Jewelry.  When asked by counsel for Johnson-Clayton, Ferebee confirmed that she did not make any attempt to value the Scheduled Jewelry prior to the preparation of her bankruptcy papers "because I was just asked what did I think it was worth at that time.  I didn't go back and find a receipt or do any kind of appraisals or anything like that . . . ."  *Id*. at 120.  Ferebee's own counsel asked her the same question:

Q. How did we come up with this list [of Scheduled Jewelry]?

A. You asked me what did I have—

Q. Okay.

A. —and I told you what I had, went down the list, and I just went through it with
you.

Q. And how did you come up with the value?

A. You asked me what I think I could get for it at a yard sale.

*Id*. at 173.

### III.  Conclusions of Law

#### A.  Objection to Discharge Under § 727(a)(5)

It is axiomatic that "the discharge granted debtors under § 727 provides them with a 'fresh

start' to begin anew.  However, the public policy behind the 'fresh start' doctrine applies only to the

honest debtor." *Caughey v. Succa* (*In re Succa*), 125 B.R. 168, 174 (Bankr. W.D. Tex. 1991); *see

also Farouki v. Emirates Bank Int'l*, 14 F.3d 244, 249 (4th Cir. 1994) ("[Section] 727 of the

Bankruptcy Code allows debtors to receive a general discharge of their obligations in keeping with

the primary purpose of bankruptcy law, to give honest debtors a fresh start 'unhampered by the

pressure and discouragement of preexisting debt.'") (quoting *Lines v. Frederick*, 400 U.S. 18, 19,

(1970)).  The Bankruptcy Code requires the debtor to fully disclose his property and his financial

affairs since "'[a] discharge is a privilege granted the honest debtor and is not a right accorded all

bankrupts.'" *WTHW Inv. Builders v. Dias* (*In re Dias*), 95 B.R. 419, 421 (Bankr. N.D. Tex. 1988)

(quoting *In re Robinson*, 506 F.2d 1184, 1189 (2d Cir. 1974)).  The Fourth Circuit Court of Appeals

has examined the denial of a debtor's discharge pursuant to § 727(a)(5) of the Bankruptcy Code:

> The Bankruptcy Code provides that a debtor should be denied a discharge if
> "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of
> assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).  This statute "gives a

> court broad power to decline to grant a discharge in bankruptcy where the debtor
> does not adequately explain a shortage, loss, or disappearance of assets." *In re
> Martin*, 698 F.2d 883, 886 (7th Cir. 1983). "In a proceeding involving Section
> 727(a)(5), the initial burden is on the party objecting to a discharge to produce
> evidence establishing the basis for his objection whereupon the burden shifts to the
> debtor to explain satisfactorily the loss or deficiency of assets." *In re Farouki*, 133
> B.R. 769, 777 (Bankr. E.D. Va. 1991), *aff'd* 14 F.3d 244, 251 (4th Cir. 1994); *In re
> Chalik*, 748 F.2d 616, 619 (11th Cir. 1984). The question of whether a debtor has
> satisfactorily explained a loss of assets is a question of fact. *Chalik*, 748 F.2d at 619.
> The debtor's explanation must be "reasonable and credible so as to satisfy the court
> that the creditors have no cause to wonder where the assets went." *Farouki*, 133
> B.R. at 777; *In re Hendren*, 51 B.R. 781, 788 (Bankr. E.D. Tenn. 1985). "The failure
> to offer documentary evidence to corroborate a debtor's testimony as to the loss or
> disposition of assets may justify the denial of a discharge pursuant to Section
> 727(a)(5)." *Farouki*, 133 B.R. at 777 (citing *Chalik*, 748 F.2d at 619).

*Powers v. Ottoson-King* (*In re Ottoson-King*), 3 F. App'x 147, 150-51, 2001 WL 167147, at *2 (4th Cir. Feb. 20, 2001) (unpublished per curiam decision). More specifically, "[i]In order to meet her burden under section 727(a)(5), the [objecting party] must 'establish that the debtor at one time owned a substantial identifiable asset, not too remote in time to the date of the commencement of the case; [and] that on the date of filing the voluntary petition the debtor no longer had the particular asset.'" *Menotte v. Hahn* (*In re Hahn*), 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007) (quoting *Bernstein v. Zeiss* (*In re Bernstein*), 78 B.R. 619, 622 (S.D. Fla. 1987)). There is no requirement for a showing of fraudulent intent under § 727(a)(5):

> Under § 727(a)(5), objecting creditors do not have to prove that the debtor
> acted knowingly or fraudulently in listing her assets or in with holding [*sic*] any
> information. *Compare* 11 U.S.C. § 727(a)(4) *with* 11 U.S.C. § 727(a)(5). Rather, all
> an objecting creditor need do is identify missing assets; once that is done, the debtor
> must explain in a satisfactory manner the loss of those assets. The 1996 U.S. Bank
> financial statement was sufficient to satisfy the objecting creditors' burden of
> identifying missing assets. *See In re Potter*, 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988)
> (relying on financial statement to show existence of assets); *In re Savel*, 29 B.R. 854,
> 856 (Bankr. S.D. Fla. 1983) (same).

*In re Ottoson-King*, 3 F. App'x at 151, 2001 WL 167147, at *3.

15

Courts have expressed a debtor's requirements in a number of ways when assessing whether a debtor's explanation is "satisfactory." To be satisfactory, "an explanation" must convince the judge and must not consist of vague and indefinite explanations. *Chalik v Moorefield* (*In re Chalik*), 748 F.2d 616, 619 (11th Cir. 1984) (quoting *In re Shapiro & Ornish*, 37 F.2d 403, 406 (N.D. Tex. 1929), *aff'd sub. nom. Shapiro & Ornish v. Holliday*, 37 F.2d 407 (5th Cir. 1930); citing *First Texas Sav. Ass'n v. Reed* (*In re Reed*), 700 F.2d 986, 993 (5th Cir. 1983); *Baum v. Earl Millikin, Inc.* (*In re Baum*), 359 F.2d 811, 814 (7th Cir. 1966)); *see also Lowe's of Virginia, Inc. v. Thomas* (*In re Thomas*), 820 F.2d 1220, 1987 WL 37635, at *2 (4th Cir. June 3, 1987) (unpublished table decision) (finding that a debtor's satisfactory explanation does not include vague and indefinite offers of proof, but rather, must be reasonable and credible). As one court has expressed:

> Although precisely what constitutes a satisfactory explanation has not been definitively stated, it is clear that the debtor must explain his or her losses in such a manner as to convince the court of good faith. As this court has previously observed, "[t]he standard by which the explanation is measured may then be said to be one of reasonableness or credibility."

*FDIC v. Hendren* (*In re Hendren*), 51 B.R. 781, 788 (Bankr. E.D. Tenn. 1985) (quoting *Slocum v. Wheeler*, 38 B.R. 842, 846 (Bankr. E.D. Tenn. 1984); citing 4 *Collier on Bankruptcy* ¶ 727.08 (15th ed. 1985)). Another court has observed:

> What explanation will be "satisfactory" rests with the court's discretion. The debtor's account need not be "far-reaching and comprehensive," but it must be more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions." Nor does the debtor need to justify "the wisdom of the . . . disposition of assets." What matters is the "completeness and truth" of the explanation. The debtor must explain—credibly and in good faith—"what really happened to the assets in question."

*Schechter v. Hansen* (*In re Hansen*), 325 B.R. 746, 763-64 (Bankr. N.D. Ill. 2005) (citations omitted). Other courts focus on the achievement of a subjective judicial contentment with the

16

debtor's explanation:

> To be satisfactory, the explanation must convince the bankruptcy judge that a debtor
> has not hidden or improperly shielded assets.  In this connection, the classic and still
> sound pronouncement was long ago formulated and stated as follows:
>
> > "The word 'satisfactory' . . . may mean reasonable, or it may mean
> > that the court, after having heard the excuse, the explanation, has the
> > mental attitude which finds contentment in saying he believes the
> > explanation—he believes what the bankrupts say with reference to
> > the disappearance or the shortage.  He is satisfied.  He no longer
> > wonders.  He is contented."

*First Am. Bank of New York v. Bodenstein* (*In re Bodenstein*), 168 B.R. 23, 33 (Bankr. E.D.N.Y.

1994) (quoting *In re Shapiro & Ornish*, 37 F.2d 403, 406 (N.D. Tex. 1929), *aff'd sub nom. Shapiro*

*& Ornish v. Holliday*, 37 F.2d 407 (5th Cir. 1930)).  The provision of documentary evidence to

explain the absence of assets is often viewed as necessary.  In *In re Chalik*, the Bankruptcy Court

held that the debtor's failure to supply documentation of how the proceeds of a $130,000.00 loan

were used in the intervening eleven months between receipt of the funds and the debtor filing a

voluntary petition under Chapter 7 of the Bankruptcy Code was fatal to the debtor meeting his

burden under § 727(a)(5), especially in light of finding the debtor's testimony lacked credibility.

*In re Chalik*, 748 F.2d at 619.  The Eleventh Circuit Court of Appeals affirmed, reasoning that the

debtor's failure to provide documentation to corroborate his testimony justified the trial court's

decision, especially since the trial judge is best-positioned to assess a witness's credibility.  *Id*. at

619-20.  Citing the holding in *Chalik*, the Fourth Circuit Court of Appeals has reminded:

> This requirement [to submit documentation] is hardly burdensome; the debtor
> must simply produce credible business records to show how he ended up in
> bankruptcy.  Although the burden is not difficult, the production of business records
> is important.  Without a valid record of his financial transactions, the debtor is asking
> the court and creditors to believe his unverified story.  A debtor who fails to produce
> records runs a substantial risk that a bankruptcy judge may deny his petition for
> discharge.  *In re Chalik*, 748 F.2d at 619.

> Although the debtor's records will provide the most convincing explanation
> of his financial problems, they are not an absolute prerequisite to a discharge.
> Section 727(a)(5) does not require a "record explanation"; it requires a "satisfactory
> explanation."  The debtor meets this burden if he convinces the judge of his good
> faith and business-like conduct.  *In re Shapiro*, 59 B.R. 844, 848 (Bankr. E.D.N.Y.
> 1986); *In re Frank*, 14 B.R. 166, 168 (Bankr. S.D. Fla. 1981).  In essence, the
> debtor's explanation is satisfactory if it is reasonable and credible.  *In re Lineberry*,
> 55 B.R. 510, 513 (Bankr. W.D. Ky. 1985); *In re Hendren*, 51 B.R. 781, 788 (Bankr.
> E.D. Tenn. 1985).

*In re Thomas*, 1987 WL 37635, at *2.  It remains to assess if Johnson-Clayton has carried her initial burden under § 727(a)(5) of the Bankruptcy Code in identifying assets of Ferebee that are presently unaccounted for, and if so proven, whether Ferebee's explanation of the loss of assets is satisfactory.

### 1. Has Johnson-Clayton Carried her Burden in Identifying Missing Assets?

Johnson-Clayton adduced evidence at trial that convinces the Court that Ferebee, prior to the filing of her bankruptcy petition, owned a substantial amount of valuable jewelry.  Exhibits of Ferebee's purchases and jewelry repair estimates were introduced and uncontroverted by Ferebee.  As those receipts, dated between 2005 and 2007, demonstrate, the retail prices and value estimates for the Missing Jewelry were substantial, exceeding $1,000.00 in most instances, and exceeding $3,000.00 for at least four of the Missing Jewelry items.  Ferebee admits that she no longer has the Missing Jewelry within her possession.  *See* Answer ¶ 40.  Ferebee commenced her bankruptcy case on December 15, 2009, and Ferebee testified that the Missing Jewelry disappeared between 2005 and 2009.  She was unable to provide a precise date for the disappearance of any specific item of the Missing Jewelry.  Under these facts, the Court concludes that Ferebee possessed the Missing Jewelry at a point in time that is proximate in time to the filing of her bankruptcy petition.  Therefore, the Court finds that Johnson-Clayton has satisfied her initial burden of producing evidence to establish the basis for her objection to the issuance of a discharge to Ferebee.

18

2.  Is Ferebee's Explanation as to her Missing Assets Satisfactory?

The burden now shifts, and the Court must determine whether Ferebee has satisfactorily explained the loss of the Missing Jewelry.  *See In re Farouki*, 133 B.R. 769, 777 (Bankr. E.D. Va. 1991), *aff'd* 14 F.3d 244, 251 (4th Cir. 1994).  Ferebee addressed the circumstances of her Missing Jewelry in her First Deposition and during her trial testimony.  Her explanation is succinct and consistent; yet, it is wholly unsupported by a scintilla of corroborating evidence.[15]  Ferebee conveniently asserts her husband, whose whereabouts are purportedly unknown despite his regular appearances at Ferebee's residence to pick up their son, *see* Exh. 54 at 6-23, stole or otherwise took possession of all of the Missing Jewelry.  Absolutely no evidence to support this allegation has been forthcoming other than Ferebee's bald assertion of the thefts.

A similar factual contention was addressed in *Grausz v. Sampson* (*In re Grausz*), 302 B.R. 820 (D. Md. 2002), *aff'd* 63 F. App'x 647 (4th Cir. 2003) (unpublished per curiam decision), where the court rejected the debtor's explanation, which was unsupported by any documentation, that his wife, or perhaps others, were in possession of some items of personal property:

> Referring to Debtor's testimony that he thought that his wife was in possession of their property, including valuable works of art, or that others with access to the house may have stolen some of it, the Bankruptcy Court found these explanations "vague and indefinite."  The court also referred to the lack of documentation as to these allegations, noting that Debtor had never filed an

---

[15] In her Second Deposition, Ferebee appears to retreat from her other assertions that her husband stole her jewelry:

Q. But you testified that you think he stole your jewelry, correct?

A. I testified that every time that my stuff came up missing and that's all I know. I didn't say he stole it.

Johnson-Clayton Exh. 54 at 18.

insurance claim or a police report for the missing property.

Debtor argues, in response, that for approximately three years after his personal property was shipped to Maryland in September 1996, he had no access to it, that he never spoke to his wife for any purpose in this regard, and that he never found out what may or may not have been shipped. He also indicates that his life was in significant personal turmoil by reason of his divorce and that therefore it was not surprising "that a small number of personal items were missing."

The record, of course, belies any suggestion that the omission of community property was necessarily a "small amount," approaching as much as $225,000. Beyond that, Debtor's explanations were not only "vague and unsatisfactory," they were in the Bankruptcy Court's opinion as the trier of fact highly suspect as to their truthfulness. The court noted that throughout the trial, "[it] has had the continuing impression of [Debtor] that he is less than truthful."

*In re Grausz*, 302 B.R. at 827-28.

Another vague explanation of theft was rejected by the court in *Richardson v. Von Behren*

(*In re Von Behren*), 314 B.R. 169 (Bankr. C.D. Ill. 2004):

[T]he Von Behrens left on an unscheduled two-week trip to Florida with their two minor children. Mr. Von Behren testified that they took about $4,000 in cash with them. Mrs. Von Behren testified that she took all of her jewelry with her in case they went out someplace nice for dinner. The jewelry was valued at between $30,000 and $50,000. At some point in the trip, the jewelry was lost or stolen. The Von Behrens were not sure what city they were in or what hotel they were staying at when the loss occurred. They did not report the loss to the police or to the hotel. They stated that the loss did not seem that important in light of the adverse publicity that they were getting from the local newspaper back home following the corporate bankruptcy. They also failed to report the loss to their insurance company. They said that they did not think that the loss was covered by insurance, but an insurance policy introduced into evidence showed that they did, in fact, have some coverage for the loss by theft of jewelry. The Von Behrens did not make any effort to read their policy or check with their insurance agent.

. . . .

. . . [T]he Court finds the Von Behrens' explanation for the loss of their jewelry in Florida to be totally inadequate. To borrow the language from *Baum* [*v. Earl Millikin, Inc*., 359 F.2d 811, 814 (7th Cir. 1966)], their explanation was "vague, indefinite and uncorroborated hodgepodge." Therefore, the Court will sustain the Trustee's objection to the Von Behrens' discharge under § 727(a)(5).

*In re Von Behren*, 314 B.R. at 174, 181; *but see First Am. Bank of New York v. Bodenstein* (*In re Bodenstein*), 168 B.R. 23, 33-34 (Bankr. E.D.N.Y. 1994) ("The Court finds that Bodenstein's testimony [the jewelry items were stolen during the summer of 1990 from the bungalow in the Catskill mountains where the Debtors were residing and were neither recovered by the police nor covered by any insurance policy] was credible, reasonable and a good faith effort to make the explanations required by 11 U.S.C. § 727(a)(5).").

In the instant matter, Ferebee's unsupported testimony that numerous pieces of her valuable jewelry were stolen by her husband is unsupported, undetailed, and unbelievable.  Further, as the trial court in *In re Von Behren*, *supra*, noted, Ferebee is simply not credible.  While her testimony as to the domestic violence she experienced in her marriage evokes sympathy,[16] the blame she places upon her husband for the removal of her jewelry, without any corroborating proof, is not a satisfactory explanation for the disappearance of such a large and valuable quantity of her assets.  As such, the Court finds that it is appropriate to deny Ferebee her discharge pursuant to 11 U.S.C. § 727(a)(5).  As a result of this conclusion, the Court finds that Ferebee's request for the imposition of sanctions upon Johnson-Clayton and her counsel pursuant to Federal Rule of Bankruptcy Procedure 9011 made within her Answer to the Amended Complaint as to Count Five should be treated as mooted thereby.

## B.  Objection to Discharge Under § 727(a)(4)(A)

Section 727(a)(4)(A) denies a debtor a discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  To deny a debtor her discharge under § 727(a)(4)(A), the objecting creditor must prove that "1) the

---

[16] *See* footnote 14, *supra*.

debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *Faircloth v Palmer* (*In re Palmer*), Adversary No. 06-76, 2007 WL 2253274, at *3 (Bankr. N.D. W. Va. Aug. 1, 2007) (citing *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000)). The party objecting to discharge has the burden of proof by a preponderance of the evidence pursuant to Federal Rule of Bankruptcy Procedure 4005.

Judge Mayer has summarized the requirements for a false oath to be fraudulent under this section:

> The false oath must be made knowingly and fraudulently. *Hatton v. Spencer*, 204 B.R. 477 (E.D. Va. 1997). Fraudulent intent can be inferred from circumstantial evidence or from a course of conduct. *Williamson*, 828 F.2d at 252, *Farouki*, 133 B.R. 769, 782 (Bankr. E.D. Va. 1991), *aff'd Farouki v. Emirates Bank, Int'l, Ltd.*, 14 F.3d 244 (4th Cir. 1994). Reckless indifference to the truth also constitutes fraud sufficient to deny a debtor his discharge. *National Post Office Mail Handlers v. Johnson* (*In re Johnson*), 139 B.R. 163, 166 (Bankr. E.D. Va. 1992).

*Pugsley v. Jalalel* (*In re Jalalel*), Adversary No. 09-01141, 2010 WL 3946420, at *3 (Bankr. E.D. Va. Oct. 8, 2010), *aff'd* 2011 WL 1348312 (E.D. Va. Apr. 8, 2011) (slip copy). Additionally, the nature of the oath must be a material one:

> For the purposes of assessing eligibility for discharge, a material false oath or omission is one which "bears a relationship to the debtor's . . . estate, [and] concerns the discovery of assets or business dealings, or the existence and disposition of property." *Fed. Dep. Ins. Corp. v. McFarland* (*In re McFarland*), 197 B.R. 222, 224 (Bankr. E.D. Va. 1995). In other words, the monetary value of the false statement or omission is not dispositive; rather, a statement or omission is material if it adversely affects the ability of the trustee or creditors to fully discover the debtor's assets and financial condition. *See Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 251 n.19 (4th Cir. 1994).

*Jalalel v. Pugsley*, No. 1:11cv163, 2011 WL 1348312, at *2 (E.D. Va. Apr. 8, 2011) (slip copy).

The purpose of § 727(a)(4)(A) is plain:

> [T]the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Mascolo*, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See In re Tabibian*, 289 F.2d 793, 797 (2d Cir. 1961); *In re Shebel*, 54 B.R. at 202.

*Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 110 (1st Cir. 1987). The statements a debtor makes in her petition, schedules, and statement of financial affairs are made under oath. *Harker v. West* (*In re West*), 328 B.R. 736, 749 (Bankr. S.D. Ohio 2004) (citing *Hamo v. Wilson* (*In re Hamo*), 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999); *Hunter v. Sowers* (*In re Sowers*), 229 B.R. 151, 158 (Bankr. N.D. Ohio 1998)). Accordingly, Ferebee's representation in her schedules concerning the value of the jewelry constitutes a statement under oath for the purposes of § 727(a)(4)(A).

Like the allegations made pursuant to § 727(a)(5), Johnson-Clayton's allegations under § 727(a)(4)(A) also involve jewelry owned by Ferebee. In this instance, however, the subject is not the jewelry allegedly stolen by Ferebee's husband, but rather the jewelry listed by Ferebee on her bankruptcy schedules, herein referred to as the Scheduled Jewelry. As set forth above, in her Schedule B list of personal property, Ferebee listed the following items under paragraph 7, which requires the debtor to list furs and jewelry: "Earrings (3), Necklace/Chain (2), Bracelet (3), Watch (1), Ring (2)," with a scheduled value of $50.00. Johnson-Clayton Exh. 39.

In her First Deposition, Ferebee wore one of the pairs of earrings, precisely identified as the "Hoop Earrings," which the Court observed Ferebee also wore at trial. The Hoop Earrings were purchased for $1,024.99 on October 18, 2006. Johnson-Clayton Exh. 49(c). Ferebee valued the

23

Hoop Earrings, as well as the other items of Scheduled Jewelry, as follows:

> Q. How did you—if the purchase price was $975,[17] how did you arrive at a $50 value for all of your jewelry?
>
> A. Because, basically, all I have is costume jewelry. This is basically the jewelry that I have. And they were saying what would you get for it if it was sold. You can't take it back to the jewelry store and get what you paid for it. And I have had it since '06. So that is how I came to $50.
>
> . . . .
>
> Q. Now, is it your testimony today that your jewelry is worth $50?
>
> A. To me, yes.
>
> Q. Do you think that was what price it would fetch on the market?
>
> A. If I had to sell them on the street, yes.
>
> . . . .
>
> Q. Why do you think that—why do you think this value of these diamond earrings has gone down so far?
>
> A. I just think that people are going to buy bigger and better things a little bit cheaper than that now.

Johnson-Clayton Exh. 53 at 136-37.  Ferebee made no attempt to have the Hoop Earrings valued.

*Id.* at 136; *see also* Partial Transcript at 120 (confirming that she (Ferebee) did not utilize receipts or appraisals in determining the value of the Scheduled Jewelry when preparing her bankruptcy papers).

Another piece of the Scheduled Jewelry was identified as a "seven millimeter, 14 caret [*sic*] wedding band," purchased in December 2005, which Ferebee testified she wears as a thumb ring

---

[17] The $975.00 price quoted by counsel for Johnson-Clayton during the First Deposition does not include the price of the jewelry service plan Ferebee apparently also purchased for the earrings, at a cost of $49.99.  *See* Johnson-Clayton Exh. 49(c).

("Thumb Ring").  *Id.* at 137.[18]  Ferebee purchased the Thumb Ring for $499.95.  *Id.* at 138.  Ferebee

described the other items of the Scheduled Jewelry as her gold and platinum wedding band; a pair

of ten carat earrings described as being "gold plated" and/or "aluminum;" a gold necklace said to

be "a little cheap necklace;" two bracelets said to be "little gold bangles;" a third bracelet said to be

"costume jewelry;" and an approximately twenty-year-old Timex watch.  *Id.* at 158-63.  Ferebee

described how she reached the $50.00 value for all of her Scheduled Jewelry as follows:

> Q. "So it is your belief that the earrings in your ears, the ten caret [*sic*] earrings, the
> gold bracelets and the costume bracelets and the two rings that you have on your
> finger, that those are worth $50?
>
> A, Yeah. I mean, that is—they asked me what would I pay for them. I said—
>
> Q. So if we wanted to pay $50 to the trustee, we could get that stuff from you?
>
> A. Yeah.

*Id.* at 163.  In her trial testimony, Ferebee testified similarly, as she stated her counsel asked her to

determine the value of the Scheduled Jewelry by what she could get for it at a "yard sale."  Partial

Transcript at 176.

Johnson-Clayton did not introduce any evidence as to the value of the Scheduled Jewelry,

by an appraisal or otherwise, at trial.

A similar factual scenario to the instant case was recently considered by the United States

District Court for the Eastern District of Virginia.  In *Jalajel v. Pugsley*, the allegations in part

concerned a debtor's alleged false oath by undervaluing jewelry.  In concluding the Bankruptcy

Court had not erred in its determination the debtor had substantially undervalued his disclosed

---

[18] As noted in the transcript, Ferebee wore the Thumb Ring to the First Deposition.
Johnson-Clayton Exh. 53 at 138.

jewelry, the District Court looked to the original purchase prices of the jewelry:

> In this case, the bankruptcy court properly found that Jalajel had omitted certain jewelry from his schedules, and had also significantly undervalued other assets, such as his Rolex watch. *See* Dkt. No. 2 at Ex. 18 ["Bankr.Mem. Op."] at 6-7. The court also properly concluded that those omissions and false valuations were made knowingly and fraudulently, or at the very least with reckless indifference to their truth or falsity. *Id.* (citing *Nat'l Post Office Mail Handlers v. Johnson* (*In re Johnson*), 139 B.R. 163, 166 (Bankr. E.D. Va. 1992) (holding that reckless indifference to the truth can also constitute fraud sufficient to deny a debtor his discharge)). Fraudulent intent can be inferred from circumstantial evidence, and in this case, the bankruptcy court found that it could be inferred from the facts that: (1) Jalajel paid substantial sums—almost $120,000.00—for his jewelry, and had already sold some of that jewelry for significant amounts of money, yet undervalued the jewelry on his schedules; and (2) with respect to the Rolex watch, Jalajel knew its brand and knew or should have known that its value was at least $3,000.00, yet listed it only as "watch" and valued it at only $100.00. *Id.* at 7; *see also* Dkt. No. 2 at Ex. 11 (list of Jalajel's jewelry, including purchase prices totaling $119,056.60, and pawned prices totaling $10,625.00).

*Jalajel*, 2011 WL 1348312, at *2. The Bankruptcy Court in *Jalajel* was also troubled by the scheduling and valuation of the jewelry by the debtor as a grouping and the reckless indifference to the truth the debtor exhibited in reaching the scheduled value:

> The schedules are false as to the extent of the jewelry owned. The debtor scheduled items as a group, labeling them "necklaces, earrings, bracelets, and watch" with an aggregate value of $1,500. The debtor purchased 28 separate pieces of jewelry for almost $120,000. While some had been sold pre-petition, the jewelry scheduled does not adequately describe what remained when the debtor filed bankruptcy. By not adequately identifying the jewelry, here by identifying it only generally as a group, he concealed the extent of his holdings. He could have listed each item separately but did not. The debtor was recklessly indifferent to the truth with respect to the valuations of his jewelry. He made no meaningful investigation into its value. He knew that he valued it highly. He had spent a lot of money—almost $120,000—for it. He knew when he tried to sell some before filing bankruptcy that the price at which he could sell it was a fraction of the price he had paid for it. While using the sales as a guide for the value when he filed might have been satisfactory, he did not use this method. He made no other effort to value the jewelry such as having it inventoried and appraised. While it can reasonably be accepted that the price the debtor could sell the jewelry he had purchased was less than the price he could sell it for, the discrepancy he discovered when he attempted to sell it alerted him to the fact that he had insufficient personal knowledge to value

26

his jewelry. Without basing an estimate of value on the sales prices he had received
or on an appraisal, he was merely guessing at the value. The low valuation misled
the trustee and the creditors. The low valuation suggested more than ordinary
jewelry, but nothing approaching jewelry with a relatively recent aggregate purchase
price of almost $120,000.

*In re Jalajel*, 2010 WL 3946420, at *3. As in *Jalajel*, Ferebee has also testified she was advised to

calculate the value of her Scheduled Jewelry by what she could obtain for it at a "yard sale." This

defense was rejected by the District Court:

> The bankruptcy court fully considered the arguments that Jalajel now
> advances, including his arguments that he had no fraudulent intent, that he relied on
> the advice of counsel regarding the "fair market" valuation of his property, and that
> his misstatements and omissions were *de minimis* and therefore immaterial. *See*
> Bankr. Mem. Op. at 7-9. The Court, however, properly rejected all of those
> arguments, finding that Jalajel had made no meaningful investigation into the actual
> value of the jewelry, such as by having it inventoried or appraised, and that he had
> actual knowledge of the higher value of the jewelry based upon the prices he had
> received in the sales of some of those pieces—information which he then failed to
> share with his counsel, thereby frustrating his counsel's ability to advise him. *Id.*

> Moreover, there is no *de minimis* exception to 11 U.S.C. § 727(a)(4)(A) or
> to the Bankruptcy Code's disclosure requirements. *See Dean v. McDow*, 299 B.R.
> 133, 140 (E.D. Va. 2003). Here, the bankruptcy court correctly concluded that the
> false statements and omissions in Jalajel's schedules were material because they
> related to the value of his estate and interfered with the ability of his creditors and
> the bankruptcy trustee to accurately evaluate his assets and investigate his financial
> holdings. Under these circumstances, and on this record, there was no clear error in
> the bankruptcy court's factual findings, nor any error in that court's conclusions of
> law, that would justify reversal of the decision to deny Jalajel a discharge.

*Jalajel*, 2011 WL 1348312, at *2-3.

Holding to the contrary is *Harker v. West* (*In re West*), 328 B.R. 736 (Bankr. S.D. Ohio

2004). The *West* court found a debtor's reliance on her counsel's instruction to value her jewelry

at pawn shop values negated any fraudulent intent on the debtor's part notwithstanding an original

purchase price fifteen times the scheduled value:

> The Trustee argues that West knowingly and fraudulently undervalued the

27

jewelry by listing its total value at $2,000 in her schedules. According to the Trustee, West surely must have known that 10 pieces of jewelry originally purchased for more than $30,000 had a value much greater than $2,000. Further, the Trustee maintains that the expert testimony offered by Karaman—who pegged the total retail value of the eight pieces of jewelry he appraised at $8,900—shows that the Debtor's $2,000 valuation was so far off the mark that it must necessarily be deemed to be a knowing and fraudulent misrepresentation on her part. West, on the other hand, asserts that she arrived at the $2,000 valuation for the jewelry simply by following her bankruptcy counsel's instruction to list her jewelry at its pawnshop value. West testified at trial that she believed at the time she filed her bankruptcy petition, and continues to believe, that she would receive no more than $2,000 if she attempted to sell all of the jewelry at a pawnshop. The Debtor also submits that if she had intended to conceal the existence of her jewelry, or create the false impression that it had minimal value, she would not have disclosed in her Schedule D (Creditors Holding Secured Claims) the fact that she owed in excess of $35,000 to five creditors whose claims were secured by jewelry (American General, Borsheim's, Jewelry Express, Saks Fifth Avenue, and Wells Fargo).

Having weighed the evidence, the Court concludes that West's undervaluation of the jewelry in her schedules does not constitute a knowing and fraudulent misrepresentation within the meaning of § 727(a)(4)(A). The Debtor's testimony—that she listed the jewelry's total value at $2,000 based on Bennington's instruction to estimate what the jewelry would bring if it were sold at a pawnshop—was credible. Bennington's advice to West appears to have been based on his misunderstanding of the appropriate standard for valuing property listed in a debtor's schedules. While the caselaw is sparse on the subject, the majority, and better-reasoned, line of authority holds that personal property should be listed in the debtor's schedules at fair-market, rather than liquidation, or distressed-sale, value. But while West may have been advised by her bankruptcy counsel to utilize a valuation standard that has not gained acceptance, the Court is not persuaded that she acted in bad faith by relying on his instruction to list her jewelry at its pawnshop, or liquidation, value. . . . And if the Court accepts the premise that West relied reasonably and in good faith on Bennington's advice to list her jewelry at its pawnshop value, then her $2,000 estimate based on this valuation standard value does not appear to be so far off the mark as to suggest an intent to defraud. The only expert testimony offered as to the jewelry's pawnshop value was Klawon's opinion that the seven pieces of jewelry he appraised had a pawnshop value of $3,860. The variance between Klawon's opinion of the jewelry's pawnshop value and West's $2,000 figure is not so pronounced as to indicate that the Debtor's valuation estimate was fraudulently made.

*In re West*, 328 B.R. at 750-51.

In the instant matter, there is no evidence, as in *In re Jalajel*, that Ferebee had sold other

28

jewelry such that she was provided with market information as to the value of assets. However, Ferebee unquestionably made no honest effort to value the Scheduled Jewelry. Her testimony makes clear she picked the $50.00 value from thin air, allegedly following instructions from counsel to provide a "yard sale" value. Just two of the items of the Scheduled Jewelry had a combined original purchase price of $1,524.94 less than five years before the bankruptcy filing, and Ferebee's only offered explanation of the precipitous descent in value of the Thumb Ring and the Hoop Earrings is "I just think that people are going to buy bigger and better things a little bit cheaper than that now." *See* Johnson-Clayton Exh. 53 at 137. This seeming explanation provides the Court with sufficient circumstantial proof that, as in *In re Jalajel*, Ferebee was, at a minimum, "recklessly indifferent to the truth with respect to the valuations of [her] jewelry" so as to satisfy the element of fraudulent intent under § 727(a)(4)(A). *In re Jalajel*, 2010 WL 3946420, at *3.[19] Here again, like in *In re Jalajel*, "[w]ithout basing an estimate of value on the sales prices [s]he had received or on an appraisal, [s]he was merely guessing at the value. The low valuation misled the trustee and the creditors." *Id.* Therefore, the Court finds Johnson-Clayton has shown by a preponderance of the evidence that Ferebee's discharge should be denied pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

C. Objection to Discharge Under § 727(a)(2)(A)

Johnson-Clayton alleges that Ferebee has concealed, or permitted to be transferred, removed,

---

[19] While Johnson-Clayton might have enlightened the Court by obtaining an appraisal of the Scheduled Jewelry, the Court is sufficiently convinced that the substantial original purchase price of but a portion of the Scheduled Jewelry, combined with no satisfactory explanation from Ferebee as to the alleged 3,000% reduction in value of the Thumb Ring and the Hoop Earrings, show that she made a false oath in valuing the Scheduled Jewelry at only $50.00. *See In re West*, 328 B.R. at 749 (concluding that the Court did not need to make a determination of the jewelry's value in order to adjudicate the denial of discharge claim under § 727(a)(4)(A)).

or concealed, her jewelry, with the intent to hinder, delay, or defraud her creditors, within one year

of the filing of her Chapter 7 petition, and thus, her discharge should be denied pursuant to 11 U.S.C.

§ 727(a)(2)(A).  The evidence adduced here by Johnson-Clayton is insufficient to sustain her burden

of proof, and, thus, to constitute a ground for denial of Ferebee's discharge pursuant to §

727(a)(2)(A).  While Ferebee's explanation for the loss of the Missing Jewelry is most insufficient

and not forthcoming, Johnson-Clayton has not produced any evidence that Ferebee has concealed

the Missing Jewelry other than the inference that her lack of plausible explanation for its loss leads

to the conclusion she has retained and concealed this valuable property by failing to schedule it in

her bankruptcy schedules.[20]  This inference is inadequate to conclude Johnson-Clayton has carried

her burden under 11 U.S.C. § 727 (a)(2)(A), and, to the extent Johnson-Clayton prays the Court deny

Ferebee's discharge pursuant to this ground, the Amended Complaint must be dismissed.

### IV.  Summary

For these reasons, the Court concludes that Ferebee should be denied her discharge pursuant

to 11 U.S.C. §§ 727(a)(4)(A) and (a)(5).  The Court finds, as a result of this conclusion, that

Ferebee's request that the Court impose sanctions upon Johnson-Clayton and her counsel pursuant

to Federal Rule of Bankruptcy Procedure 9011, made within her Answer to the Amended Complaint

as to Count Five, should be treated as mooted thereby.  Further, the Court finds that Count Five of

the Amended Complaint should be dismissed to the extent it seeks a denial of Ferebee's discharge

pursuant to 11 U.S.C. § 727(a)(2)(A).

By reason of the Court's conclusion that Ferebee should be denied her discharge pursuant

---

[20] Johnson-Clayton was candid at trial in her admission upon cross-examination that she
had no proof that Ferebee had any jewelry other than the Scheduled Jewelry.

30

to §§ 727(a)(4)(A) and (a)(5), the remainder of the Amended Complaint, consisting of Counts One, Two, Three, and Four and seeking a declaration of non-dischargeability of the debt owed by Ferebee to Johnson-Clayton, should be treated as mooted.   Likewise, the Court finds that the Motion to Amend the Complaint to conform it to the evidence pursuant to Federal Rule of Civil Procedure 15(b), as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7015, made during the trial by counsel for Johnson-Clayton should also be treated as mooted.   The Court also finds that the request for the imposition of sanctions upon Johnson-Clayton and her counsel pursuant to Federal Rule of Bankruptcy Procedure 9011 made by Ferebee within her Answer to the Amended Complaint as to Counts One through Four is likewise moot.

A separate Order will be entered by the Court consistent with the findings and conclusions contained in this Memorandum Opinion.

The Clerk shall transmit a copy of this Memorandum Opinion to John M. Ryan, Jr., counsel for the Plaintiff, Sharon Johnson-Clayton; Kenneth A. Moreno, counsel for the Defendant, Letitia Kolette Ferebee; and to Debera F. Conlon, Assistant United States Trustee.

**Entered this 15th day of February, 2012, at Norfolk in the Eastern District of Virginia.**

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

31